# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                           No.  CIV 15-1181 MV/KBM
                                   No.  CR  10-0622 MV

WALTER LEE DEITER,

      Defendant.

## PROPOSED FINDINGS OF FACT AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on Defendant-Movant Walter Lee Deiter's ("Deiter's") Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255.[1] *Doc. 3.* By an Order of Reference filed June 30, 2016, this matter was referred to the undersigned to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of this habeas action. *Doc. 14.* The Court held oral argument as to certain legal issues in Deiter's § 2255 Motion on November 16, 2016, and thereafter permitted supplemental briefing by the parties. *See Doc. 19.* The Court is satisfied that an evidentiary hearing is unnecessary, because Deiter's Motion and the record of the case conclusively establish that he is not entitled to relief. *See* 28 U.S.C. § 2255(b) (providing that a court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is

---

[1] Citations to "Doc." Refer to docket numbers filed in Civil Case No. 15-1181 MV/KBM. Citations to "CR Doc." refer to the attendant criminal docket in Criminal Case No. 10-0622 MV.

entitled to no relief"). Having reviewed all the submissions of the parties and the relevant law, and being otherwise fully advised in the premises, the Court recommends that Deiter's § 2255 Motion be denied.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At 12:38 a.m. on November 12, 2009, Albuquerque Police Department ("APD") Officer Patricia Whelan was dispatched to an Albuquerque apartment complex to investigate an argument between a man and a woman. *CR Doc. 224* at 192. Officer Whelan testified that  upon her arrival at the apartment complex, she observed a male and female in the middle of the street, who separated upon seeing law enforcement and began walking in different directions. *Id.* at 194. According to Officer Whelan, she followed the male, who was later identified as Deiter, while another officer followed the female, who was later identified as D'Leah Harris. *Id.* at 196, 200-01.

Deiter proceeded to the nearby apartment complex, a two-story structure with an open breezeway. *Id.* at 196-97. Officer Whelan lost sight of him for a short time when he went behind a staircase; however, minutes later, she saw him "pop up" on the breezeway of the second floor of the apartment building.  *Id.* at 197-201.  According to Officer Whelan, Deiter appeared nervous and was "looking kind of up and down the breezeway." *Id.* at 199. Officer Whelan instructed him to come down the stairs to speak to the officers.  *Id.* She testified that before Deiter came down the stairs, he made a "kind of squatting, bending motion" but that she was unable to observe his hands because of a three to four-foot wall that was in front of him. *Id.* at 201. When Deiter eventually came down the stairs to speak with officers, Officer Whalen asked APD Officer Sammy Marquez to go to the second floor breezeway to see "what was

dropped." *Id.* at 204-05. As Officer Marquez began to climb the stairs to the second floor, Deiter, who was standing near Officer Whelan and another officer at the time, began to run. *Id.* at 207. APD Sergeant Glenn St. Onge fired a Taser at Deiter, which struck him in the back. *Id.* at 210. Deiter fell to the ground, and Officer Whalen handcuffed him. *Id.* at 211.

Meanwhile, Officer Marquez's inspection of the second-floor breezeway revealed an abandoned holster containing a revolver. *Id.* at 132, 139-40. At Sergeant St. Onge's direction, Officer Marquez did not touch the weapon. *Id.* at 140-42. Dean Ferguson, a civilian crime scene specialist employed by APD, responded to the scene because of the deployment of a Taser and also so that he could identify, collect, and preserve physical evidence, including the revolver. *Id.* at 142-43, 200-01, 205, 208-09. Mr. Ferguson photographed the scene and processed the firearm while wearing gloves. *Id.* at 206, 209, 213, 217, 219. Officer Marquez, in turn, checked the serial number of the firearm, also while wearing gloves. *Id.* at 144-45. Paramedics were called to inspect Deiter and to remove the Taser prongs. *Id.* at 212.

The firearm and holster discovered by Officer Marquez were sent to the APD Crime Laboratory for DNA and fingerprint testing. *Id.* at 114-15, 124. A forensic scientist employed by the laboratory examined the holster and firearm. *Id.* at 123-25. At trial, she testified that she found a mixture of DNA on the firearm, indicating that two persons had deposited DNA on it but that Deiter was the major contributor. *Id.* at 144-46. The holster, on the other hand, contained only Deiter's DNA. *Id.* at 140. The scientist testified that the probability that another Caucasian person would have the same DNA profile as Deiter was one in 140 sextillion. *Id.* at 151-52.

Deiter was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). *CR Doc. 2*. During litigation of his criminal case in federal court, he was represented by four different attorneys. First, Assistant Federal Public Defender Michael Keefe represented him for approximately 13 months. *CR Doc. 9*. Next, Charles Knoblauch was appointed to replace Mr. Keefe, and he continued to do so for approximately five months. *CR Doc. 56*. Next, Ryan Villa and his co-counsel, Josh Ewing, represented Deiter. *CR Doc. 88*. Mr. Villa and Mr. Ewing engaged in pretrial motions practice, including filing a motion to compel production of DNA elimination standards and a motion seeking an order for a jury instruction regarding lost evidence; they also responded to the Government's pretrial motions. *See, e.g., CR Docs. 93, 97, 106, 119, 121, 125, 127, 129, 141, 143, 144, 145,147, 152*.

Mr. Villa represented Deiter throughout his jury trial, which took place in July and August of 2012. During that trial, the Government called eight witnesses to testify, and Mr. Villa cross-examined each witness. *See CR Docs. 224-27*. Two DNA analysts, both recognized by the Court as expert witnesses, also testified, one for the prosecution and one for the defense. *See CR Docs. 226-27*.

Deiter's DNA expert, Michael Spence, used a PowerPoint presentation to explain the secondary transfer of DNA. *CR Doc. 227* at 18-30. Dr. Spence testified that "it was within the realm of possibilities" that there was a "transfer event," involving, for example, saliva, blood, or sweat, whereby Deiter's DNA was secondarily transferred to the firearm and holster following the officers' physical contact with him. *Id*. at 18-44. Even so, Deiter was ultimately convicted of being a felon in possession of a firearm, apparently for the

second time in the District of New Mexico. *Compare CR Doc. 204 with United States v. Deiter*, 00cr1466 MV.

Deiter's Presentence Report detailed his criminal history, which consisted of 13 prior convictions. *CR Doc. 302-1*, PSR, at ¶ 27-39. His applicable guideline range was calculated as 210 to 262 months based on a total offense level of 33 and a criminal history category of V. *See id.* at ¶ 96. Deiter was determined to be an armed career criminal under the Armed Career Criminal Act ("ACCA") and was, thus, subject to a mandatory minimum sentence of 15 years and up to life imprisonment. *See id.* at ¶ 43, 95. According to the Presentence Report, the predicate offenses that qualified Deiter under the ACCA were: 1) a state court conviction for distribution of cocaine; 2) a 1987 federal conviction for bank robbery; and 3) a state court conviction for possession of a controlled substance with intent (cocaine). *See id.* at ¶ 22, 38.

Deiter attaches to the reply brief in this habeas proceeding the Indictment and Judgment from his 1987 Florida federal bank robbery conviction, asserting that he pled guilty to 18 U.S.C. § 2113(a) and § 2. *See Doc. 15*, Ex. A & B. While the Judgment shows that he pled guilty to "§ 2113(a)(2) as charged in count 2 of the indictment," there is, in fact, no subsection (a)(2) contained within the Federal Bank Robbery Act found at § 2113(a). *See* § 2113(a). Count 2 of the Indictment charges Deiter with violations of "Sections 2113(a) and 2." *Doc. 15*, Ex. A.

Broadly speaking, § 2113(a) criminalizes taking or attempting to take by force and violence, or by intimidation from the person or presence of another property belonging to or in the custody of a banking institution. *See* 18 U.S.C. § 2113(a). Section 2 of Title 18, in turn, provides that "[w]hoever commits an offense against the United

States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2.  Thus, it appears that in Count 2 of the Indictment Deiter was charged with aiding and abetting a federal bank robbery, to which he pled guilty.  This understanding squares with factual basis provided in Deiter's Presentence Report; that is, at the time of the underlying bank robbery, Deiter and another individual entered Florida National Bank, where his co-defendant placed a briefcase on the counter and handed the teller a note instructing her to give him everything in the bank drawer. *CR Doc. 302-1*, PSR, at 11-12. Although Deiter apparently did not approach the counter, the teller observed him enter the bank with the co-defendant and noticed that he appeared to signal the co-defendant by snapping his fingers. *Id.*

At his sentencing on January 23, 2014, the Honorable Martha Vasquez sentenced Deiter pursuant to the ACCA but granted him a variance for a below-guidelines sentence to 180 months for being a felon in possession of a firearm. *See CR Doc. 266, 268.*  Under the ACCA, this sentence was the minimum sentence that Judge Vazquez could lawfully impose. Indeed, the sentence was 30 months less than the low-end of the calculated guideline range.

Deiter filed a timely Notice of Appeal to the Tenth Circuit Court of Appeals, and Attorney D. Eric Hannum represented him throughout the appellate proceedings. *See CR Doc. 280.* The issues presented on appeal were: (1) whether the district court abused its discretion by denying Defendant's motion to compel DNA samples from the police officers, and (2) whether the statute prohibiting a felon from possessing a firearm and ammunition was unconstitutional. *United States v. Deiter*, 576 F. App'x 814

(10th Cir. 2014). On September 10, 2014, Deiter's conviction and sentence were affirmed by the Tenth Circuit Court of Appeals. *CR Doc. 283.* He did not petition for certiorari with the United States Supreme Court.

As to Deiter's contention that the District Court abused its discretion when it denied his motion to compel DNA samples, the Tenth Circuit reasoned that "[t]here was little need for the samples because Mr. Deiter was able to advance his defense theory of secondary transfer without them." *Id*. at 816. Additionally, the court noted that the production of DNA samples may not have supported his defense theory and that even if the officer's DNA was found on the firearm and/or holster, it would not definitively proven that his DNA came from the officer's handling of the items rather than his own. *Id*. Finally, the court explained that compelling the officers to provide DNA samples implicated privacy interests and that Deiter had provided insufficient justification to intrude on those interests. *Id*.

**II. Legal Standard**

Under 28 U.S.C. § 2255(a),

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A § 2255 motion must allege facts that, if proven, would warrant relief from his conviction or sentence. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995).

Collateral review under § 2255 "is not an alternative to appellate review for claims that could have been presented on direct appeal but were not." *United States v.*

*Megleby*, 420 F.3d 1136, 1139 (10th Cir. 2005). However, the movant may overcome this procedural bar by showing either of two well-recognized exceptions. *See United States v. Cervini*, 379 F.3d 987, 990 (10th Cir. 2004). First, he must show good cause for failing to raise the issue earlier as well as actual prejudice to his defense. *Id.* at 990. Cause may be established under this exception by demonstrating ineffective assistance of counsel. *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002). Otherwise, the movant must show that failing to consider the federal claims will result in "a fundamental miscarriage of justice." *Cervini*, 379 F.3d at 990.

### III. Discussion

In his § 2255 Motion, Deiter asserts various claims of ineffective assistance of counsel, including that Mr. Villa's performance was deficient when he 1) introduced excerpts of a belt tape transcript but failed to cross-examine the person in the transcript who reported seeing a man with a firearm, 2) failed to obtain EMT reports documenting Deiter's injuries and failed to call EMT personnel as witnesses, and 3) failed to argue that Deiter's prior bank robbery conviction did not qualify as a predicate offense under the ACCA. *Doc. 3* at 14-17. Additionally, Deiter argues that Mr. Hannum, his appellate counsel, was ineffective when he filed an appellate brief without Deiter's final approval. *Id.* at 6. Finally, Deiter insists that his sentencing enhancement under the ACCA is unconstitutional under *United States v. Johnson*, 135 S. Ct. 2551 (2015). *Id.* at 8-9.

### A. Ineffective Assistance of Counsel Claims

Plaintiff's ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court devised a two-step inquiry to determine whether a lawyer's poor performance deprived an accused of his

Sixth Amendment right to assistance of counsel. *Id.* at 686-87. In order to establish an ineffective assistance claim, a movant must demonstrate (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced [his] defense." *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir. 1999). To establish deficient performance, a movant must show that his attorney made "errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment," *Williams v. Taylor*, 529 U.S. 362, 390 (2000), and that his legal "representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688. To establish prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The prejudice component focuses on the question of whether counsel's allegedly deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Williams*, 529 U.S. at 393. Courts may, if they prefer, analyze the prejudice prong first and exclusively. *See, e.g., Scoggin v. Kaiser*, 186 F.3d 1203, 1207 (10th Cir. 1999).

### i. Belt Tape Transcripts and Witnesses

On January 5, 2016, the Court ordered the United States to file a response to Deiter's § 2255 Motion, which it did on March 7, 2016. In its response, the Government referenced the transcript of Deiter's jury trial, particularly portions containing the trial testimony of Officer Patricia Whelan. *See Doc. 7*. Deiter moved the Court to provide him with a copy of the trial transcript. *Doc. 8*. The Court granted Deiter's motion in part, ordering the Clerk to provide, at no cost to Deiter, the portion of the trial transcript

containing the testimony of Officer Whelan. *See Doc. 10* at 2. Deiter, who was appointed counsel to represent him in connection with his § 2255 Motion, filed a reply to his § 2255 Motion on July 16, 2016, providing references to the trial transcript to support his arguments.

Deiter's first ineffective assistance claim now ripe for review relates to Mr. Villa's decision to read aloud excerpts from an excluded belt tape transcript and his failure to cross-examine the witness whose statements were recorded therein. In contrast to Deiter's assertions in his § 2255 Motion, the Government clarifies that neither the belt tape transcript nor the belt tape were actually entered into evidence. *Doc. 7* at 14; *see also CR Doc. 224* at 2-3, 250; *CR Doc. 225* at 2-3; *CR Doc. 226* at 2.

According to Deiter, Mr. Villa's reference to the belt tape transcript led to portions of it being admitted into evidence without objection, by which he claims he suffered prejudice. *Doc. 3* at 14, 15. Relatedly, he contends that Mr. Villa's failure to cross-examine the witness in that belt tape who reported seeing a man with a firearm on the night in question was also ineffective. *Id.* at 14.

Officer Whelan's trial testimony reveals that she could not recall whether there was a witness at the subject apartment complex who observed something relevant on the night in question. *CR Doc. 224*, at 243-44. Despite a ruling from Judge Vazquez that Officer Whelan's belt tape transcript was not admissible, other than for impeachment purposes, *CR Doc. 224* at 247, Mr. Villa asked Officer Whelan whether reviewing a transcript of that belt tape recording might refresh her recollection. *Id.* at 244. Officer Whelan responded that it would. *Id.* At a bench conference requested by the Government, Mr. Villa clarified that he did not seek admission of the transcript and,

instead, only intended to use it to refresh Officer Whelan's recollection and to demonstrate certain steps that she failed to take in her investigation. *Id.* at 250. Over the Government's objection, the Court permitted Mr. Villa to use the transcript in this way. *Id.* at 254. The portion of the transcript that Mr. Villa read into the record included the following statement by a witness:

> I was sitting on my bed watching a movie and I didn't open the door or anything. I looked in, I just heard him yelling and I looked out the peephole and he was yelling at her and all this other stuff and he had a gun at this point, I didn't go outside or anything, I didn't want to get involved.

*Doc. 225* at 7. Mr. Villa went on to ask Officer Whelan whether, according to the transcript, the witness had been asked to provide her name or address. *Id.* at 9. Officer Whelan admitted that the transcript did not include a request that the witness provide such information. *Id.*

Deiter maintains that instead of reading aloud from the very transcript that Mr. Villa had earlier fought to exclude, he "should have simply refreshed Officer Whelan's memory with copies of the transcripts rather than reading any portion of it into the record." *Doc. 15* at 10-11. He suggests that this transcript, which the Court had previously determined would not be admitted, was "the only evidence from any witness that positively placed a man in possession of a firearm at the scene." *Id.* at 11. Deiter further insists that Mr. Villa failed to cure his error by testing the witness' out-of-court statements through cross-examination. *Id.*

In support of his contentions, Deiter cites persuasive authority from the Supreme Court of South Dakota: *Freeman v. Leapley*, 519 N.W.2d 615 (S.D. 1994). *Doc. 15* at 11. In *Freeman*, a state habeas petitioner asserted that his trial counsel was ineffective in a criminal prosecution for grand theft of an automobile. 519 N.W.2d at 616. The court

agreed that his counsel's performance was deficient when he offered into evidence a police report with hearsay evidence inculpating the petitioner in the car theft. *Id.* at 618. While the court acknowledged that the decision to introduce the report was a "tactical decision [made] in an effort to attack the thoroughness of the police officers' investigation," it nevertheless found the approach to be unreasonable under the facts of that case. *Id.* at 618. The court reasoned: "[d]efense counsel could have attacked the thoroughness of the investigation without admitting the police report. By offering the written statement into evidence, she presented the jury with documentary evidence containing a statement that [the petitioner] stole the car." *Id.* Despite its finding of ineffectiveness, however, the court ultimately determined that the petitioner had not been denied a fair trial, as the evidence against him was overwhelming. *Id.* at 618-19.

Here, the Government notes that during her trial testimony Officer Whelan had difficulty remembering specific details of the incident, which had occurred more than two and a half years earlier. *Doc. 7* at 13 (citing *Crim. Doc. 224* at 190-246). The Government recounts that after she testified on cross-examination that she did not remember certain detains of her investigation, Mr. Villa refreshed her recollection with a portion of the belt tape transcript involving a witness who had reported seeing a man with a firearm yelling at a woman. According to the Government, Mr. Villa cross-examined Officer Whelan about her failure to memorialize the witness' name and address and to determine if Deiter might have been the same person who was allegedly observed with a firearm. *Doc. 7* at 14.

The Court must resolve two ineffectiveness claims related to Officer Whelan's belt tape transcript: first, whether Mr. Villa's representation was deficient when he read

aloud from the transcript and, second and relatedly, whether his representation was deficient when he failed to cross-examine the witness whose statements were recorded in that belt tape transcript. The Court finds that the latter claim is much easier to resolve than the former. Mr. Villa simply could not have cross-examined the witness whose statement was recorded on the belt tape. As the Government explains, she was never called as a witness in the trial.

Deiter's first ineffectiveness claim is a closer question. With the benefit of hindsight, Mr. Villa's decision to read aloud from the belt tape transcript seems somewhat counterproductive. After all, he effectively highlighted a statement by an unknown witness, to which the jury most likely would not have otherwise been privy, that seemingly corroborated the Government's allegations that Deiter possessed a firearm during the course of an altercation with D'Leah Harris.

Even so, Mr. Villa's actions in this case are distinguishable from those of trial counsel in *Freeman*. Unlike counsel in *Freeman*, Mr. Villa stopped short of offering the belt tape transcript into evidence, which meant that the transcript was not available to the jury during its deliberations. Further, there is no question that he read portions of the belt tape transcript with the aim of demonstrating that Officer Whelan's investigation was less than thorough, which in the Court's view, he seems to have established to some extent. Ultimately, the Court finds that the fact that the transcript was not actually admitted into evidence, coupled with Mr. Villa's use of what is generally a sound trial strategy – that is, to attack the thoroughness of the law enforcement investigation – is enough to characterize his decision to read the belt tape transcript as a reasonable one,

especially given the strong presumption against a finding of ineffectiveness. *See*
*Strickland*, 466 U.S. at 689.

Even if the presiding judge disagrees and finds Mr. Villa's decision to read aloud
the transcript unreasonable, Deiter cannot show prejudice in the face of the evidence
presented against him. To summarize: the jury heard testimony that Officer Whelan,
responding to a middle-of-the-night call regarding an altercation in a parking lot,
observed Deiter nervously squatting behind a wall on a second-floor apartment
breezeway. When she dispatched a fellow officer to determine what Deiter may have
dropped on that breezeway, Deiter began to run. The fellow officer's inspection of the
breezeway revealed a holster containing a revolver, which officers testified they did not
touch without the use of gloves. A forensic scientist testified that DNA testing revealed
that the firearm contained the DNA of two individuals, with Deiter being the major
contributor, and that the holster contained *only* Deiter's DNA. The scientist also testified
that the probability that another Caucasian person would have the same DNA profile as
Deiter was one in 140 sextillion.

Officer Whelan's observations, combined with this strong, scientific evidence
linking Deiter to the firearm, can only be described as overwhelming evidence that
Deiter did in fact possess the firearm in question.

### ii. EMT Reports and Possible Witness Testimony

Deiter also maintains in his § 2255 Motion that Mr. Villa was ineffective by failing
to obtain EMT reports documenting injuries that he sustained when tased by law
enforcement and by failing to call as witnesses EMT employees who could testify
regarding the extent of his injuries. *Doc. 3* at 16-17. The role of the EMTs in this case

appears to have been limited to their removal of the Taser prongs from Deiter and their medical clearance of him to be taken into custody.

The Government notes that neither party called any EMTs as witnesses at trial, arguing that their testimony was not relevant to the issues before the jury. Deiter counters, insisting that the testimony could have supported the secondary DNA transfer theory espoused by Dr. Spence.  As the Government notes, however, Dr. Spence made no suggestion that testimony by EMT personnel would be helpful in evaluating whether secondary DNA transfer actually occurred.

The Court is unwilling to characterize Mr. Villa's decision not to elicit testimony from EMTs or to obtain EMT reports as ineffective.  *See Strickland*, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.")  This is especially true where there is nothing in the record to indicate that the testimony or reports of responding EMT personnel would have shown significant injuries to Deiter or otherwise supported his secondary DNA transfer theory. Moreover, as noted above, Deiter was simply not prejudiced by Mr. Villa's failure to elicit EMT testimony or reports, given the overwhelming evidence against him.

### iii. Appellate Attorney's Filing of Brief

Deiter's final claim of ineffective assistance of counsel is targeted at his appellate counsel, Mr. Hannum. More particularly, he contends that Mr. Hannum failed to obtain his final approval before filing his appellate brief, which he claims deprived him of due process. *Doc. 3* at 6. Once again, the appellate brief filed by Mr. Hannum asserted that

the trial court abused its discretion by refusing to compel DNA samples from the officers on the scene and that 18 U.S.C. § 922(g)(1) was unconstitutional. *See United States v. Deiter*, 576 F. App'x 814 (2014). Deiter does not provide any legal support for his assertion that Mr. Hannum should have conferred with him more extensively before filing his appellate brief.

True, an appellate counsel's failure to raise certain issues on appeal may sometimes constitute ineffective assistance of counsel, *see Ellis v. Hargett*, 302 F.3d 1182, 1189 (10th Cir. 2002). Here, however, Deiter neglects to explain how the outcome of his appeal would have been any different had he personally reviewed or provided input regarding the issues addressed in the brief drafted and filed by Mr. Hannum. While Deiter does suggest in his reply brief that Mr. Hannum was ineffective by failing to challenge the constitutionality of his sentence enhancement under the residual clause of the ACCA, there is nothing to indicate that Deiter himself could have somehow foreseen the action that the United States Supreme Court would take a year later in *Johnson v. United States,* 135 S. Ct. 2551 (2015) ("*Johnson II*"). Indeed, it was Deiter's counsel, not Deiter, who was in the best position to evaluate legal arguments and to make strategic decisions about which issues should be raised on appeal. Further, as it turns out, there was no prejudice to Deiter from the omission of a *Johnson II*-like argument from his appellate brief; after all, the Court will fully consider herein the constitutionality of his sentencing enhancement under the ACCA in light of *Johnson II*.

### B. *Johnson II* Claims

The final issue addressed by Deiter in his § 2255 Motion involves his sentencing enhancement under the ACCA following *Johnson II*.

The ACCA enhances sentences for those who qualify. It provides:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be . . . imprisoned not less than fifteen years . . . .

18 U.S.C. § 924(e)(1). A "serious drug offense" is either a federal drug offense "for which a maximum term of imprisonment of ten years or more is prescribed by law" or a state law offense "involving manufacturing, distributing or possessing with intent to manufacture or distribute a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." *See* § 924(e)(2)(A). The Act defines "violent felony" as any crime punishable by imprisonment for a term exceeding one year that "has an element the use, attempted use, or threatened use of physical force against the person of another" (i.e. force clause[2]) or "is burglary, arson, or extortion, involves use of explosives" (i.e. enumerated offenses clause) "or otherwise involves conduct that presents a serious potential risk of physical injury to another" (i.e. residual clause). § 924(e)(2)(B).

The residual clause of § 924(e)'s "violent felony" definition was determined to be unconstitutionally vague in *Johnson II*.[3] Accordingly, individuals may not be subject to the ACCA if their prior convictions qualified as "violent felonies" only under the residual clause in § 924(e)(B)(ii). *Id.* Here, the parties agree that whether or not Deiter's predicate bank robbery conviction qualifies as a "violent felony" hinges upon the

---

[2] Some courts refer to this same clause as the "elements clause." *See, e.g., United States v. Harris*, 844 F.3d 1260, 1262 (10th Cir. 2017).

[3] In contrast, the Supreme Court held in *Johnson v. United States*, 559 U.S. 133 (2010) ("*Johnson I*") that the Florida felony offense of battery by "[a]ctually and intentionally touch[ing]" another person does not has "as an element the use . . . of physical force against the person of another" and thus does not constitute a "violent felony" under § 924(e)(1).

application of the ACCA's force clause – that is, whether it "has as an element the use, attempted use, or threatened use of physical force against the person of another." *See* § 924(e)(2)(B)(i). The Government maintains that bank robbery remains a "violent felony" under the ACCA's force clause following *Johnson II*; Deiter contends otherwise.

### i. Whether Federal Bank Robbery Satisfies the ACCA's Force Clause

When determining whether an offense is a "violent felony" under the ACCA, courts generally apply the "categorical approach," considering only the offense's statutory elements and not the actual facts underlying the prior conviction. *United States v. Smith*, 652 F.3d 1244, 1246 (10th Cir. 2011). Under this approach, it is unnecessary that "every conceivable factual offense" contemplated by the statute fall within the ACCA. *Id.* at 1246. Instead, courts consider whether the "conduct encompassed by the elements of the offense, in the ordinary case, qualifies under the ACCA as a violent felony." *Id.*

When a statute contains a divisible set of elements in the alternative, only some of which would constitute violent felonies, courts may employ the "modified categorical approach." *Descamps v. United States*, 133 S. Ct. 2276, 2281 (2013). Under this approach, courts "look[] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis*, 136 S. Ct. 2243, 2249 (2016). This approach does not apply to statutes which "enumerate[] various factual means of committing a single element." *Id.* at 2249.

Here, the relevant federal statute provides:

Whoever by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to

18

obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny –

Shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 2113(a). In addition to bank robbery "by force and violence, or by intimidation," the statute also criminalizes obtaining or attempting to obtain property from a bank by extortion as well as entering or attempting to enter a bank with the intent to commit a felony affecting the bank. *See id.* As such, § 2113(a) seems to contain a divisible set of elements in the alternative: (1) taking property from a bank by force and violence or intimidation; (2) obtaining or attempting to obtain property from a bank by extortion, or (3) entering a bank intending to commit a felony affecting the bank. *See United States v. McBride*, 826 F.3d 293, 296 (6th Cir. 2016) (suggesting that § 2113(a) is a divisible statute because, in addition to bank robbery by force and violence or intimidation, it also criminalizes entering a bank intending to commit a felony affecting the bank); *United States v. McGuire,* No. 16-3282, 2017 WL 429251, at 2 n.4 (10th Cir. Feb. 1, 2017) (concluding that § 2113(a) "includes at least two sets of divisible elements: (1) taking, or attempting to take, by force, violence, or intimidation, property from a bank; and (2) entering or attempting to enter any bank, credit union, or savings and loan association with the intent to commit a felony); *United States v. McGuire*, No. 16cv1166 JTM, 2016 WL 4479129 (D. Kan. Aug. 25, 2016), *certificate of appealability*

19

*denied,* 2017 WL 429251 (10th Cir. Feb. 1, 2017) (noting that "§ 2113(a) also includes what is essentially a separate extortion offense," and citing *Descamps* for the proposition that the court need only consider, when determining whether federal bank robbery qualifies under the career offender guideline's force clause, the portion of statute constituting generic robbery).

In any event, when applying the modified-categorical approach to Deiter's conviction, it is clear that he was convicted of federal bank robbery "by force, violence, and intimidation" and not of bank robbery by extortion or of entering a bank with intent to commit a felony. *See Doc. 15*, Ex. A, at 3, Ex. B. This offense has three elements: (1) the defendant intentionally took from the person or presence of the person money or property; (2) the money or property belonged to or was in the possession of a federally-insured bank at the time of the taking; and (3) the defendant took the money or property by means of force and violence or intimidation. *See* Tenth Circuit Pattern Jury Instructions No. 2.77.

Deiter first argues that unarmed federal bank robbery under § 2113(a) cannot qualify as a "violent felony" under the ACCA, because bank robbery, when committed through intimidation, does not satisfy the force clause. He maintains that placing a person in fear of bodily harm, as courts have interpreted bank robbery by intimidation, does not necessarily have as an element the intentional use, attempted use, or threatened use of physical force. He notes that the Supreme Court "set forth the controlling definition of 'physical force' in *Johnson I*," where it explained that "physical force" in the context of the ACCA means "violent force – that is, force capable of causing physical pain or injury to another person." *Doc. 15* at 4 (quoting *Johnson*, 559

U.S. at 140-45). Deiter also emphasizes that the language of § 2113(a) contains no requirement that a defendant *intend* to intimidate and that the Eleventh Circuit, where Deiter was convicted, "has clearly stated that federal bank robbery is a general intent crime which requires only a showing that the defendant "knew that he was physically taking the money," not that he intended to use intimidation. *Doc. 15* at 8; *Doc. 20* at 8 (citing *United States v. McCree*, 225 F. App'x 860, 863 (11th Cir. 2007)). *But see United States v. Jenkins*, 651 F. App'x 920 (11th Cir. 2016) (holding that § 2113(a) qualifies as a crime of violence under the force clause of the career offender guideline).

Deiter insists that the Government, and the out-of-circuit opinions that it references, have "misdefine[d] "intimidation" as the intentional use of an implied threat of violent force, where the statute does *not* require the intentional use of explicit or implicit force, violence or fear of injury. *Doc. 20* at 10. He explains that a determination of whether a defendant has committed bank robbery by intimidation "is guided by an objective test focusing on the accused's actions (whether an ordinary person would have **inferred** a threat of violence). *Id.* at 8 (citing *McCree*, 225 F. App'x at 863). But the Court is not persuaded by Deiter's arguments.

First, the Tenth Circuit Criminal Pattern Jury Instruction 2.77 helpfully expands upon § 2113(a)'s statutory provisions, explaining:

> To take "by means of intimidation" is to say or do something in such a way that a person of ordinary sensibilities would be fearful of bodily harm. It is not necessary to prove that the alleged victim was actually frightened, and neither is it necessary to show that the behavior of the defendant was so violent that it was likely to cause terror, panic, or hysteria. However, a taking would not be by "means of intimidation" if the fear, if any, resulted from the alleged victim's own timidity rather than some intimidating conduct on the part of the defendant. The essence of the offense is the taking of

money or property accompanied by intentional, intimidating behavior on the part of the defendant.

*Id.* Thus, a conviction for federal bank robbery requires proof that a defendant engaged in "intentional, intimidating behavior." Further, the Tenth Circuit has defined intimidation in the context of § 2113(a) as "an act by defendant 'reasonably calculated to put another in fear,' or 'conduct and words . . . calculated to create the impression that any resistance or defiance by the [individual] would be met by force.'" *United States v. Lajoie*, 942 F.2d 699, 701 n.5 (10th Cir. 1991) (internal citations omitted).

While federal bank robbery by force and violence or intimidation may not require a *specific* intent to intimidate, *see United States v. Armstrong*, 1997 WL 337540, at *2 (10th Cir. June 19, 1997) (unpublished), "[t]he presence or absence of an element of specific intent does not dispositively determine whether a prior conviction qualifies as a violent felony under the ACCA," *United States v. Ramon Silva*, 608 F.3d 663, 673 (10th Cir. 2010). In *Ramon Silva*, the Tenth Circuit held that aggravated assault (i.e. "engaging in conduct with a deadly weapon that causes the victim to believe he or she was about to receive a battery") constituted a "violent felony" under the ACCA, even though the statute only required general criminal intent rather than specific intent to cause apprehension in the victim. *Ramon Silva*, 608 F.3d at 669-73. According to the court, so long as a crime requires that a defendant intentionally engaged in conduct constituting "the threatened use of physical force," it constitutes an offense with an element of the threatened use of physical force under the *Johnson I* standard, even if the defendant did not specifically intend to communicate such a threat. *Id.* at 673.

Given that intimidation occurs in the context of a bank robbery when a defendant says or does something "in such a way that a person of ordinary sensibilities would be

fearful of bodily harm," the Court is satisfied that federal bank robbery by intimidation has as an element the threatened use, albeit sometimes implicit, of physical force against the person of another. Actions which would cause a reasonable victim to be intimidated during the course of a bank robbery necessarily implicate the threatened use of physical force. As such, the Court declines to adopt the proposition advanced by Deiter: that federal bank robbery may occur even without the use, attempted use, or threatened use of physical force of the type contemplated in *Johnson I*.

Following *Johnson II*, both the Sixth and the Eleventh Circuit held that federal bank robbery is a crime of violence under the career offender sentencing guideline's identical force clause. *See United States v. McBride*, 826 F.3d 293, 295-96 (6th Cir. 2016); *United States v. Jenkins*, 651 F. App'x 920 (11th Cir. 2016) (unpublished). Further, the Fourth Circuit in *United States v. McNeal*, 818 F.3d 141, 153 (4th Cir. 2016) held that federal bank robbery, even by intimidation, is a crime of violence within the meaning of the force clause of § 924(c)(3), reasoning as follows:

> [T]o secure a conviction of bank robbery "by intimidation," the government must prove not only that the accused knowingly took property, but also that he knew that his actions were objectively intimidating. Bank robbery under § 2113(a) therefore satisfies the criterion . . . that, to qualify as a crime of violence, an offense must require either specific intent or knowledge with respect to the use, threatened use, or attempted use of physical force.

818 F.3d at 155.

There is only one federal district court of which this Court is aware that has reached a contrary conclusion. Courts in the Western District of Washington, in both *Doriety v. United States*, 16cv0924, *Doc. 12* (W.D. Wash. Nov. 10, 2016) (unpublished) and *Knox v. United States*, No. C16-5502BHS, 2017 WL 347469, at *2 (W.D. Wash.

Jan. 24, 2017) (unpublished), have held that federal bank robbery is not a crime of violence under the career offender sentencing guideline. In the first case, *Doriety*, upon which Deiter relies, the court concluded that the statute does not explicitly require that a defendant intentionally use force, violence, or fear of injury. *Doriety*, 16cv0924, *Doc. 12* at 9. Noting that federal bank robbery may be committed through "intimidation," which the Ninth Circuit previously determined did not require a threat of violent physical force, the court found that § 2113(a) did not satisfy the force clause. *Id.* (citing *United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983) for the proposition that intimidation does not require a threat of violent physical force). The court explained that the "minimum culpable conduct" of § 2113(a) "does not even require the presence of another person, let alone the threat of "violent force" against that person. *Id.* at 9 (referencing the portion of § 2113(a), which provides that a defendant may be convicted of federal bank robbery for "entering 'any bank . . . with intent to commit in such bank . . . any felony affecting such bank . . . or any larceny.'"). In *Knox*, another judge within the same district simply adopted the rationale set forth in *Doriety*. *See Knox*, 2017 WL 347469, at 2.

But this Court is not bound by Ninth Circuit law; nor does it agree with the premise that bank robbery by intimidation does not necessarily involve a threat of violent physical force. Further, given that § 2113(a) is a divisible statute and the modified categorical approach is implicated, it is of no consequence to the present analysis, as Deiter suggests, that a defendant may also be convicted under § 2113(a) by entering a bank with the intent to commit a felony without threatening violence. Here,

Deiter was, without question, convicted of federal bank robbery "by force, violence, and intimidation." *Doc. 15,* Ex. A, at 3 and Ex. B.

More importantly, a recently-issued opinion by the Tenth Circuit seems to compel the result the Court reaches here. In *United States v. McGuire*, No. 16-3282, 2017 WL 429251 (10th Cir. Feb. 1, 2017) (unpublished), on consideration of a request for a certificate of appealability, the court concluded that "[e]ven construing the movant's application liberally, no reasonable jurist would debate the district court's denial of habeas relief." *Id.* at *2. District Judge Martin of the District of Kansas premised his denial of § 2255 relief upon the rationale that, even following *Johnson II*, the federal bank robbery satisfies the force clause of the career offender guideline.[4] *McGuire*, 2016 WL 4479129, at *2-3. Later, in determining whether to issue a certificate of appealability as to Judge Marten's decision, the Tenth Circuit concluded that "[a]lthough § 2113(a) includes a taking 'by intimidation,' courts have stated that 'intimidation' involves the threat of physical force." *McGuire*, 2017 WL 429251, at *2 (citing *McBride*, 826 F.3d at 295-96 and *Lloyd v. United States*, 16cv0513, 2016 WL 5387665, at *5 (D.N.M. Aug. 31, 2016)). Moreover, it explained that "courts have consistently held that federal bank robbery qualifies as a predicate offense under the Guidelines' [force] clause." *Id.* (citing *McBride*, 826 F.3d at 295-96, *United States v. Jenkins*, 651 F. App'x 920, 925 (11th Cir. 2016), and *United States v. Selfa*, 918 F.2d 749, 751 (9th Cir. 1990)). Thus, it appears that the Tenth Circuit has adopted the majority view on this issue and would find that

---

[4] Significantly, the language of force clause in the career offender guideline is identical to the language of force clause in the ACCA. *Compare* U.S.S.G. § 4B1.2(a)(1) *with* 18 U.S.C. § 924(e)(2)(B)(ii).

federal bank robbery constitutes a "violent felony" under the ACCA's identical force clause. As such, the Court recommends that the presiding judge so find here.

## II. Whether Aiding and Abetting a Federal Bank Robbery Satisfies the ACCA's Force Clause

Deiter also contends that aiding and abetting an unarmed bank robbery is not a violent felony under the force clause of the ACCA. He asserts that the Tenth Circuit case in *United States v. Fell*, 511 F.3d 1035 (10th Cir. 2007) is controlling in this regard. *Doc. 20* at 4.

In *Fell*, the court determined that Colorado's conspiracy to commit second-degree burglary did not have as an element the use, attempted use, or threatened use of physical force, and did not qualify as one of the enumerated crimes under the ACCA. *Fell*, 511 F.3d at 1037. The *Fell* court emphasized that conspiracy to commit second-degree burglary did not require a person to perform an overt act directed toward the entry of the building, and reasoned that it, therefore, did not qualify as a violent felony under the ACCA. *Id.* at 1038-44.

Deiter notes that the Tenth Circuit then extended *Fell's* holding to attempt crimes in *United States v. Martinez*, 602 F.3d 1166 (10th Cir. 2010). According to Deiter, the *Fell* analysis now applies equally to other inchoate crimes, beyond conspiracy, if the respective statute permits criminal convictions based upon preparatory conduct. *Doc. 20* at 4 (citing *Martinez*, 602 F.3d at 1171-74).

The issue before the Tenth Circuit in *Martinez* was whether second-degree attempted burglary constituted a violent felony under the ACCA's residual clause. Relying upon its rationale in *Fell*, the court reasoned that because "one can commit the offense . . . in many ways without an act directed toward entry of the building, the risk of

physical injury to another is too speculative to satisfy the residual provision of [the ACCA]." *Id.* at 1170. In other words, the court determined that second-degree attempted burglary failed to satisfy the ACCA's now-unconstitutional residual clause.

Contrary to Deiter's position, neither *Fell* nor *Martinez* resolve the issue now before the Court – whether aiding and abetting a bank robbery is a violent felony under the ACCA's force clause? Indeed, at least one circuit court has distinguished aiding and abetting crimes from attempt and conspiracy crimes in an analogous context, and it appears that the Tenth Circuit may follow suit.

In *United States v. Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016), the Eleventh Circuit considered whether aiding and abetting a Hobbs Act robbery was a crime of violence under the force clause of § 924(c). There, the defendant sought permission to file a second or successive § 2255 motion following *Johnson II*, arguing that his aiding and abetting conviction no longer qualified as a crime of violence, and that his § 924(c) sentence, therefore, could not stand. *Id.* at 1303. The court considered whether a defendant who had been convicted of aiding and abetting a Hobbs Act robbery was responsible for all the elements of the Hobbs Act robbery. *Id.* It explained that aiding and abetting under 18 U.S.C. § 2 is "not a separate federal crime, but rather an alternative charge that permits one to be found guilty as a principal for aiding or procuring someone else to commit the offense." *Id.* at 1305. It emphasized that "[a] person who 'aids, abets, counsels, commands, induces or procures' the commission of an offense 'is punishable as a principal.' . . . Indeed, '[u]nder § 2, the acts of the principal become those of the aider and abettor as a matter of law.'" *Id.* at 1305 (internal citations omitted). Ultimately, the Eleventh Circuit determined that because the

substantive offense, Hobbs Act robbery, had as an element the use, attempted use, or threatened use of physical force, the defendant's aiding and abetting conviction likewise had such an element. *Id.*

The Eleventh Circuit's approach finds some support in the United States Supreme Court's analysis in *Gonzales v. Duenas-Alvarez,* 549 U.S. 183 (2007), a case arising in the immigration context. There, the Court took up the issue of whether a prior conviction qualified as a deportable "theft offense" under 8 U.S.C. § 1101(a)(43)(G) and, in doing so, applied the analytical framework that it had previously developed in *Taylor v. United States*, 495 U.S. 575 (1990) when determining whether a crime qualified as a "violent felony" under the ACCA. *See Gonzales*, 549 U.S. at 183. The so-called categorical approach articulated in *Taylor*, which has since been modified by *Descamps v. United States*, 133 S. Ct. 2276 (2013) and *Mathis v. United States*, 136 S. Ct. 2243 (2016), required courts to consider whether the elements of a prior offense matched the elements of the generic version of a crime by looking to the state statute that defined the crime of conviction. *See Taylor*, 495 U.S. 575. Applying this framework to the immigration context, the Supreme Court determined that a California conviction for aiding and abetting a theft fell within the scope of the generic definition of theft. *Gonzales*, 549 U.S. at 189. In other words, the Court treated the aiding and abetting conviction the same as ordinary theft for purposes of applying § 1101, explaining that the "law treats aiders and abettors during and before the crime the same way it treats principles; and . . . the immigration statute must then treat them similarly as well." *Id.* at 190. Thus, because "state and federal criminal law now uniformly treats principals and aiders and abettors alike," aider and abettor liability falls within the scope of a generic

crime, at least for purposes of defining a generic offense in federal immigration statutes. *See id.*

The Tenth Circuit appears to follow an approach similar to the one adopted by the Eleventh Circuit in *Colon.* Before denying a certificate of appealability in *McGuire*, the court noted that the defendant there had been convicted of "aiding and abetting in the taking, by force and violence and by intimidation, [of a federal bank robbery]." *McGuire,* 2017 WL 429251, at *2. But the fact that the defendant was convicted as an aider and abettor was inconsequential to the Court's analysis. It explained in a footnote: "That McGuire was convicted as an aider and abettor and not as a principal is irrelevant to our analysis. Under 18 U.S.C. § 2, '[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.'" *Id.* at *2, n.3.

The court's reliance upon this rationale in *McGuire*, together with the Eleventh Circuit's persuasive approach in *Colon* and the Supreme Court's helpful aider-and-abettor analysis in *Gonzales*, leads this Court to recommend the rejection of Deiter's argument that aiding and abetting a bank robbery is not a violent felony.

**IT IS HEREBY RECOMMENDED** that Deiter's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2225 (*Doc. 3*) be denied and that his claims be dismissed with prejudice.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**